E-FILED
Tuesday, 06 September, 2011 11:24:20 AM
Clerk, U.S. District Court, ILCD

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

ISAAC BRIGGS,                          )
                Plaintiff,             )
        vs.                            )    No. 10-3081
MANUEL ROJAS, GERARDO ACEVEDO          )
and MICHAEL P. RANDLE,                 )
                Defendants.            )

        Deposition of ISAAC BRIGGS a/k/a Josef Dupree,
taken at the instance of the Defendants, on the 27th
day of July, 2011, scheduled to begin at 1:00 p.m. at
the Office of the Illinois Attorney General, 500
South Second Street, Springfield, Illinois, before
Carla J. Boehl, Certified Shorthand Reporter and
Notary Public, pursuant to notice.

DAVIS REPORTING SERVICE
3 Hickory Hills Drive
Springfield, Illinois  62707
217/546-6868

Reported by:
Carla Boehl, CSR
Lic. #084-002710

**2**

APPEARANCES:

MS. MELISSA A. JENNINGS
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62706
Ph. (217) 782-9056

        (Appearing on behalf of the
        Defendants)

I N D E X

WITNESS                                    PAGE

ISAAC BRIGGS

Examination by Ms. Jennings                  4


EXHIBITS                               IDENTIFIED

Exhibit A                                   34

        (Exhibit retained by Attorney Jennings)

EXHIBIT
A
tabbies

**3**

1    (Whereupon the witness was
2        duly sworn by the Reporter.)
3            ISAAC BRIGGS
4  called as a witness on behalf of Defendants, having
5  been first duly sworn, was examined and testified as
6  follows:
7            DIRECT EXAMINATION
8    BY MS. JENNINGS:
9      Q.   We are here on the case Central District
10  10-3081.  Mr. Briggs, are you ready to proceed with
11  the deposition today?
12      A.   Yes, I am.
13      Q.   You understand that you are under oath?
14      A.   Yeah.
15      Q.   And that means that basically you are
16  sworn to tell the truth so it is just like the same
17  as if we were in court and there was a judge and jury
18  here.
19      A.   Okay.
20      Q.   You understand that?
21      A.   Right.
22      Q.   Have you ever had your deposition taken
23  before?
24      A.   Yes.

**4**

1      Q.   And you understand that it is the time
2  for me to ask you questions about the lawsuit you
3  filed against the defendants.  You respond to those
4  questions and we will get a copy of the transcript of
5  that, something that can be used in the record for
6  the court.
7            And then if I ask you a question and you
8  don't understand the question, feel free to ask me to
9  rephrase it or ask it in another way.  Because if you
10  don't ask, then I am going to assume that you
11  understood what I was asking.
12            Does that make sense?
13      A.   Yeah.
14      Q.   And, again, if I ask you something and
15  five or ten minutes down the line you remember you
16  want to add something to your answer, feel free to
17  just interrupt to add something so we can make sure
18  we get it on the record.
19      A.   All right.
20      Q.   Then for the court reporter to be able to
21  get everything down, both of us will have to answer
22  out loud.  So you can't nod your head because that's
23  something she can't write down.
24            Does that make sense?

**5**

1    A.   Yeah.

2    Q.   Just like we can't say uh-huh or huh-uh

3  because that makes sense to us right here but, when

4  it is written down, it is not clear if that's a yes

5  or no answer.

6    A.   Okay.

7    Q.   So make sure to say yes or no to every

8  question.

9    A.   Okay.

10    Q.   Does that all make sense to you?

11    A.   Yes, it does.

12    Q.   Do you have any questions about that or

13  how this will proceed?

14    A.   I have one question.  Will I be obtaining

15  an indigent copy of this proceeding?

16    Q.   I believe you will have to ask the court

17  for permission and they may be able to work that out

18  for you, and we can address that a little bit toward

19  the end, about what happens when we are finished.

20    A.   Okay.

21    Q.   I represent the defendants, Manuel Rojas,

22  Warden Acevedo and Former Director Michael Randle, in

23  this case.  Are you taking any medications today,

24  just any at all?

**6**

1    A.   Yeah, I have high blood pressure medicine

2  and I have medicine for psychological issues.

3    Q.   What are those psychological issues?

4    A.   The psychiatrist, I don't know what they

5  diagnosed, but they gave me medicine, I believe,

6  Depakote, and I brought that with me.

7    Q.   Do you know if that's like for depression

8  or anxiety or --

9    A.   All that.

10    Q.   All of it, okay.

11    A.   And some more.

12    Q.   Are any of the medications of the kind

13  that would affect your ability to remember things or

14  to answer questions?

15    A.   Possibly.

16    Q.   Do you think you have any problem

17  answering questions today about the lawsuit that you

18  filed?

19    A.   No, I don't believe I have any problem

20  with answering questions.

21    Q.   If there is any question that I ask that

22  you are not unsure of or that you feel like maybe you

23  can't remember, just let me know and we can deal with

24  that when the time comes.

**7**

1    A.   All right.

2    Q.   Along the same lines, if you need a

3  break, just let me know and we can take a break.

4    A.   Okay.

5    Q.   Like I said, we probably won't be here

6  for very long.  But if you do need a break, let me

7  know.

8    A.   Okay.

9    Q.   Other than the medications that you are

10  on and those issues, do you have any other mental

11  diseases that might affect your ability to answer

12  questions?

13    A.   Not that I know of.

14    Q.   Is there anything such as a death of a

15  family member or anything like that that would --

16  that you are upset about today that would affect your

17  ability to answer questions?

18    A.   My mom has took ill and we are on our way

19  to see her after this proceeding.  She had suffered a

20  severe setback within the last 24 hours and prior to

21  that she had been going back and forth from

22  hospitalizations to nursing home care.

23    Q.   Do you think that's something that would

24  prevent you from giving full answers today?  Is that

**8**

1  something that you are distracted about?

2    A.   I don't think so.

3    Q.   If when we are finished today, if after

4  we are completely done and you later remember

5  something you wanted to add because you may be a

6  little distracted today, feel free to send that to me

7  in a letter and we can get that added to the record

8  so that we know that that's in addition to your

9  answer.

10    A.   Okay.

11    Q.   What's the highest level of education

12  that you have completed?

13    A.   I have had some college and some

14  vocational certification.

15    Q.   Do you have any -- do you have your

16  associates degree or is it just a few credits?

17    A.   It's a few credits.

18    Q.   What about previous employment?  Are you

19  currently working?

20    A.   No, I am not.

21    Q.   Prior to your time in prison where were

22  you working?

23    A.   I was working with temp agencies.

24    Q.   Temp agencies.  What kind of work were

9

1 you doing?

2     A. Assembly line work.

3     Q. Any other previous employment, other kinds of jobs that you have worked before?

    A. Other than I worked at McDonald's as a

6 teenager. I was in the United States Navy and I

7 worked in the Navy.

8     Q. When were you in the Navy?

9     A. From 1985 to 1988.

10     Q. What date did you arrive at Hill

11 Correctional Center?

12     A. I arrived around, I would say, possibly

13 mid-June, about mid-June 2009.

14     Q. The document I have says June 17. Does

15 that sound about right?

16     A. Yeah, that's about right.

17     Q. Of 2009?

18     A. Yeah.

19     Q. Upon your arrival at Hill what date did

20 you request a change of your religion?

21     A. Sometime beginning in July and the end of

22 July 2009.

23     Q. Did you send two separate requests then?

24     A. I believe, if my memory serves me right,

10

1 it was in the beginning term of July of 2009 and then

2 I -- yeah, I believe there was two requests.

3     Q. Two requests?

4     A. Yeah.

5     Q. Your complaint, I think, states that the

6 request made to Chaplain Rojas was July 31. Does

7 that sound about right?

8     A. Yes.

9     Q. Of 2009?

10     A. Right.

11     Q. And that request was made directly to the

12 chaplain?

13     A. Yes, it was.

14     Q. How did you go about making those kinds

15 of requests when you were in prison?

16     A. I asked the wing officer and the inmate

17 workers for forms to request a change in religion.

18     Q. And then once you got the form what did

19 you do with it?

20     A. I filled it out and submitted it in the

institutional mail to Chaplain Rojas.

22     Q. And is that the typical procedure

23 whenever anyone wanted to request their religion?

24     A. Pretty much, other than if you were to

11

1 catch the chaplain, say, in movement to the chow hall

2 or whatever, the gym, then you would ask right there

3 in an oral manner and it could get done like that.

4     Q. So in this case you made that written

5 request, filling out the form and sending that to

6 Chaplain Rojas?

7     A. Right.

8     Q. What did it say on that request, if you

9 recall?

10     A. It said something about -- let me see

11 here. Religious affiliation, to, you know, fill that

12 out and submit it to the chaplain and then, I

13 believe, he would call you or send you a message

14 about, you know, what would happen in the change of

15 religious affiliation.

16     Q. What religion were you prior to

17 requesting the change?

18     A. On my ID it was Christian.

19     Q. And you were requesting to change to

20 what?

21     A. Nation of Islam.

22     Q. So your request said that that was the

23 request you were making, was a change from Christian

24 to Nation of Islam?

12

1     A. Yes, ma'am.

2     Q. Did you receive a response from the

3 chaplain?

4     A. Yeah, I did.

5     Q. What was the response?

6     A. He sent me a memorandum basically saying

7 to the best of my knowledge that you cannot be

8 recognized as a participant of the Nation of Islam

9 until the Ramadan and the Feast of Ramadan has

10 finished, and then you can be put on after that.

11     Q. So he essentially denied your request

12 then?

13     A. Yes.

14     Q. Do you remember what date you received

15 that response?

16     A. I believe it was no later than August 1,

17 2009.

18     Q. What did you do once you received that

19 denial?

20     A. I believe I wrote him a request and

21 explained that him and my counselors -- that's what

22 it was. I wrote him at my counselors' request

23 explaining that the Ramadan and -- well, that the

24 Ramadan is a pillar, one of the requirements or

**13**

1 obligations of Islamic practice, and I would like to
2 know why I can't participate in the Ramadan as well
3 as, you know, participate as a Nation of Islam
4 worshipper.
5     Q.   And what was their response to that, if
6 any?
7     A.   I don't think they did respond.
8     Q.   Did you write a grievance on it?
9     A.   I eventually wrote a grievance.
10     Q.   Do you remember the date of the
11 grievance?
12     A.   It was -- had to have been -- I think the
13 grievance was dated late August, around about maybe
14 August 23 of 2009, which addressed the not responding
15 to my request slips and things of that nature for
16 being put on the list to participate with the Nation
17 of Islam and then Ramadan festivities.
18     Q.   You sent that grievance to your
19 counselor?
20     A.   Yeah, I sent the copies to my counselor
21 and then thereafter I wind up sending a copy of it to
22 Springfield, anticipating a transfer of the
23 institution.
24     Q.   Did you ever send it to the grievance

**14**

1 office at Hill or any other prison?
2     A.   Well, I believe at Hill only.  I
3 attempted to try to get it to the grievance officer
4 and I wrote a request to the grievance officer.  See,
5 around about the 23rd of August, I believe they had
6 placed me in segregated confinement, and this kind of
7 took precedent over my religion issue.  And dealing
8 with the disciplinary measures that had me in the
9 segregated confinement, I had focused the grievance
10 as well on that, that issue.
11     Q.   Then I think that we have had this in the
12 record a couple of times with my previous motion, but
13 you were at some point transferred from Hill,
14 correct?
15     A.   Yeah, correct.
16     Q.   And you went to where?
17     A.   Menard Correctional Center.
18     Q.   And so that transfer as well as your
19 segregation, that's kind of why your grievances
20 didn't necessarily make it the right ways or some
21 people maybe didn't respond, is that right?
22     A.   Well, in a way, but not exactly.  While
23 still pending transfer, which took place around about
24 October, mid-October of 2009, from August of 2009 up

**15**

1 until October of 2009, I had been doing my best to
2 get the counseling and the grievance officer and the
3 warden at Hill Correctional to deal with the issues
4 in their entirety, including their religion
5 deprivation.
6     Q.   Do you recall the dates of Ramadan in
7 2009?
8     A.   I believe it was for the entire month of
9 August 2009.  It's an entire month, I believe.
10     Q.   You believe it started August 1 of 2009,
11 around then?
12     A.   I believe so, right.
13     Q.   Something that I believe -- it may be in
14 your complaint, I believe it is in some of the
15 documents, it said August 22 through September 20 or
16 21.
17     A.   Okay.
18     Q.   Does that sound like it is probably right
19 or --
20     A.   It could be.  I am not sure but, you
21 know, I knew --
22     Q.   You just don't remember now because it's
23 been a couple of years?
24     A.   Yes, right.

**16**

1     Q.   So if that's in your complaint that it is
2 August 22 through, I think it is, September 20, 21,
3 would you say that's probably a more accurate date
4 than what you put in you complaint?
5     A.   If I put it in the complaint, then I was
6 going by the facts as best I could.  So, yeah, I
7 would go by that.
8     Q.   When were you transferred to Menard
9 again?
10     A.   I believe it was around about mid-October
11 2009.
12     Q.   What was the reason for that transfer, if
13 you know?
14     A.   They had wrote rule infractions against
15 me and they resulted in a recommendation that I be
16 transferred from Hill to Menard Correctional.
17     Q.   So was it what they would normally call a
18 disciplinary transfer?
19     A.   Right, a disciplinary transfer.
20     Q.   What date did you enter segregation for
21 those issues?
22     A.   Around about August 23, 2009.
23     Q.   What happened to make you go to
24 segregation?

**17**

1    A.    It started out as an investigation of
2    some items of mine coming up stolen and I informed
3    the wing officer about these issues and then I feared
4    for my safety and they put me in segregated
5    confinement as a means to have me safe.  And when I
6    spoke to the internal affairs personnel, they went
7    completely against basically what I was saying to a
8    place that landed me in investigative status as being
9    put into segregated confinement and thwarted my means
10   to acquire good conduct credit restoration.  So it
11   all culminated in Warden Acevedo concurring with the
12   recommendation to transfer me from Hill to Menard
13   Correctional Facility.
14       Q.    Were you eventually given a disciplinary
15   ticket?
16       A.    Yes, I was.
17       Q.    Do you recall the date of that ticket?
18       A.    I think it was the 24th of August 2009
19   and the 25th of August 2009 and sometime in the first
20   week of September 2009.
21       Q.    Three separate tickets?
22       A.    Three separate tickets, yeah.
23       Q.    What kind of discipline did you receive
24   as a result, other than the transfer?

**18**

1    A.    There was a month loss of good conduct
2    credit, the segregated confinement for approximately
3    six months, C grade, a loss of visitation privileges.
4       Q.    When you transferred to Menard in
5    mid-October 2009, did you have orientation upon your
6    arrival at Menard?
7       A.    No.
8       Q.    Did you have an opportunity to change
9    your religion at that time?
10       A.    I don't believe, no, huh-uh.
11       Q.    When you arrived at Menard, did you make
12   a request to their chaplain to change your religion?
13       A.    I believe I put in a request to change
14   the religion with the chaplain at Menard, but I never
15   heard anything back from them.
16       Q.    When did you put in that request?
17       A.    It had to have been within the first or
18   second week of my arrival in the segregation unit.
19       Q.    So you transferred from seg to seg?
20       A.    Exactly.
21       Q.    Was the change made after you put that
22   request in?
23       A.    No, I have never heard about it.  No, I
24   wasn't.

**19**

1    Q.    Was your religion ever changed prior to
2    your release?
3       A.    No, it wasn't.
4       Q.    The Department of Corrections documents
5    state that it was changed to Nation of Islam on May
6    6, 2011.  Is that something you have no idea that
7    that actually happened?
8       A.    Yeah, I am aware of that, but that wasn't
9    prior to my release.  I released in February.
10       Q.    So prior to February they had not changed
11   it?
12       A.    Exactly.
13       Q.    When did you re-enter after your release
14   in February?
15       A.    Around about March the 17th, 2011.
16       Q.    And did you request your change at that
17   point?
18       A.    No.
19       Q.    When did you request the change of
20   religion that actually took place in May of 2011?
21       A.    Once I had arrived at the Lawrence
22   Correctional Center which would have been after April
23   20 of 2011.
24       Q.    When you went back in March, where did

**20**

1    you go to, what prison?
2       A.    Menard.
3       Q.    Then you were transferred from Menard to
4    Lawrence?
5       A.    Lawrence Correctional Center.
6       Q.    And it was at Lawrence then that you made
7    the request that actually took place, the change that
8    was made?
9       A.    Exactly.  Because when I left Menard in
10   March of 2011, its receiving classification unit
11   doesn't allow you basically no social activities or,
12   you know, things of that nature, to change your
13   religion.  It is basically they are just examining
14   you, knowing your medical histories, psychological
15   history.  And you are pretty much in one cell until
16   they put you at a parent institution, you know,
17   absent the receiving classification.  Other than
18   that, there is not going to be nothing done for you.
19       Q.    So the entire time you were at Menard,
20   after you had been released and came back, that was
21   essentially just waiting to evaluate you and classify
22   you so that you could be sent to a specific
23   institution?
24       A.    Right, pending an interview with the

**Page 21**

1  prisoner review board.

2      Q.  And after that is when you were sent to

3  Lawrence?

4      A.  Exactly.  I don't want to say -- I was

5  not released until February 28, 2011, and the

6  religion change had never been effective as of this

7  issue stemming back late July, early August 2009.

8      Q.  And you were at Menard from October 14,

9  2009, or around then until when you initially paroled

10  out February 28, 2011?

11      A.  That's correct.

12      Q.  So it was over a year, about a year and

13  four months or so?

14      A.  Yes.

15      Q.  And that entire time that you were at

16  Menard they did not change your religion?

17      A.  No, they didn't.

18      Q.  How many times did you request that it be

19  changed while you were at Menard?

20      A.  I would say several times.

21      Q.  Probably more than five times?

22      A.  Yeah, about four to five times.

23      Q.  More than ten?

24      A.  No.

**Page 22**

1      Q.  Somewhere between five and ten times?

2      A.  Yes.

3      Q.  How many times did they respond to that

4  request with a denial?

5      A.  They never responded.

6      Q.  Who is the warden at Menard -- or not the

7  warden, the chaplain at Menard?

8      A.  The chaplain, I don't recall his name.

9      Q.  It was not the same chaplain as at Hill,

10  though, correct?

11      A.  Correct.

12      Q.  In your complaint and I think briefly at

13  the beginning of our discussion today you mentioned

14  that you believe you sent two requests at Hill to

15  change your religion?

16      A.  If that's in the record.

17      Q.  Yeah, today you said that you sent one

18  early July and then one July 31?

19      A.  Right.

20      Q.  In your complaint you mention something

21  on July 10, if I can find the exact language.  And

22  the reason I bring it up is because it wasn't clear

23  to me what exactly took place on that date.  Let's

24  see if I can find it.

**Page 23**

1              (Pause.)

2          It says, "In a documented dated June 10

3  of 2009 and entitled Memorandum, Plaintiff requested

4  to officially change his religion from Christian to

5  the Nation of Islam as of July 31."  So I am curious

6  and I can show you this, read what you wrote.  I am

7  just curious; it says the document dated June 10.  It

8  is right there at the top of the page.  I don't know

9  if maybe you were saying that the request you made

10  July 31 was as a result of --

11      A.  Okay.  That's a document that I believe I

12  obtained which is entitled Memorandum and then I was

13  permitted to request to change my religion from

14  Christian to the Nation of Islam.

15      Q.  So that's when you received -- it

16  probably was something like the procedure how to do

17  it?

18      A.  I know what it was.  The document was

19  dated, entitled Memorandum, and I believe it was

20  dated June 10 on that document as an already

21  pre-stamped like official stationary of the

22  chaplain's documents.  So it had the date on there

23  and that's probably what I was putting down.

24      Q.  What did that say?  Is that what Gate

**Page 24**

1  essentially told you, that you could have your

2  religion changed?

3      A.  Yeah, it allowed me, other than writing a

4  request from scratch, a document how to go about

5  doing that process to change religion.

6      Q.  So after receiving that document that was

7  dated June 10, then you wrote your July 31, 2009,

8  request to change your religion?

9      A.  Right, I dated it on that time that I was

10  putting it through as the date of July 31.

11      Q.  Okay.  We have the three separate

12  defendants in this case, so I am going to go through

13  each one briefly and just ask about your claim

14  against each one.

15      A.  Okay.

16      Q.  So the first one is Chaplain Rojas.  What

17  exactly is your claim against him?

18      A.  He deprived me of my right to change my

19  religion

20      Q.  So pretty much your complaint against him

21  is that you requested your change on July 31, he

22  denied it on August 1, not allowing you to change

23  from Christian to Nation of Islam, right?

24      A.  Right, in its entirety.  Even when I was

25

1  in segregated confinement, he never -- let's say,
2  okay, Ramadan ends the end of September 2009. Well,
3  I hadn't even left the institution. I am still there
4  until mid-October. He never came to make good on his
5  claim.
6       Q.  Did you make any additional request after
7  Ramadan ended?
8       A.  Yeah, I did because they had already ran
9  the gamut on not letting me participate in Ramadan.
10  So I still enquired to ask about the change and I was
11  out of the institution within weeks after that.
12       Q.  So the request that you made after
13  Ramadan, did you do the same thing, writing it on the
14  form and sending it to the chaplain?
15       A.  No, I was writing request slips. I
16  didn't get no more forms. I am in the segregation
17  unit now.
18       Q.  But it was written, essentially it was a
19  written down request to the chaplain requesting the
20  change?
21       A.  Yeah, that is how, Ms. Jennings, when I
22  arrived at Menard in October, sometime in early
23  November to mid-November the segregation counselor
24  comes with the grievances that I received back from

26

1  Springfield while still at Hill Correctional, and
2  they were just the way they were when I submitted
3  them to Springfield and submitted them back through
4  the administrative process at Hill after they came
5  back from Springfield, say sometime after, I believe,
6  September the 10th of 2009. In between that time,
7  either September 10 or the 17th of 2009 and then up
8  to the time I transferred, I was able to give them
9  those documents back and attempt to, you know,
10  exhaust my institutional remedies.
11       And when I got to Menard and the
12  counselor came, Mrs. Barbara Mueller, she came with
13  the papers and they were not answered at all. They
14  were in the condition I submitted them.
15       Q.  The grievances?
16       A.  Right.
17       Q.  So for Chaplain Rojas then, basically you
18  wanted him to do two things or one of two things,
19  initially to change your religion when you requested
20  it July 31, correct?
21       A.  Uh-huh.
22       Q.  And then because you said that could not
23  happen, then you wanted him to change it once Ramadan
24  ended, correct?

27

1       A.  Right, and that didn't happen.
2       Q.  Is there anything else that he did that
3  is the basis of your claim against him?
4       A.  None that I can think of at this moment.
5       Q.  Warden Acevedo, did you write him -- or
6  let me just let you -- I guess, what's your claim
7  against him?
8       A.  Oh, that as he is chief administrator
9  officer he did not basically respect my request to
10  him to talk to Warden -- or, excuse me, Chaplain
11  Rojas or his assistant warden or anyone else thereof,
12  counselors, about, you know, going to put -- at that
13  time I am under the alias name Dupree -- put Mr.
14  Dupree into the Islamic services. He never did
15  anything to that effect, knowing that this is what I
16  was trying do.
17       Q.  You essentially wanted him then to tell
18  the chaplain to make the change?
19       A.  Right, right, as the chief administrative
20  officer.
21       Q.  So then the chaplain would be essentially
22  subordinate under him?
23       A.  Right, right, they are all under his --
24  right, his watch.

28

1       Q.  Did you speak to the warden in person
2  about this issue?
3       A.  Yeah, I did, when he came over to, I
4  guess, do monthly or weekly checks on the segregation
5  unit floor to see how individuals are doing, are they
6  feeling suicidal or what are their issues, what are
7  the issues they want people over there for
8  investigations and all types of things. So when he
9  would come to do those, I would take out to him to
10  speak to him about my religion change, amongst the
11  other issues I had with my grievance which is, you
12  know, it addresses more than the religion changes in
13  there.
14       Q.  When was this that you spoke to him about
15  your religion issues?
16       A.  Well, this was during times from the time
17  I was placed in segregation confinement for basically
18  investigative means all the way to the time they
19  transferred me. So it had to be at least several
20  times.
21       Q.  Would you say it was once a week, once
22  every two weeks on average?
23       A.  No, when he would come. And he would
24  come maybe within a two-week period. And if you

29

1 could catch him, and that's another thing, to be able
2 to stop him as he is coming down.  Because he may
3 only come specifically for one cell and to speak to
4 certain people.  So when he is coming, you know, you
5 get an opportunity, other than him making rounds and
6 going cell to cell.  That would be maybe every other
7 week or, you know, maybe once a month, you know, so.
8      Q.  Do you have any sort of estimate on the
9 number of times you were able to actually catch him
10 and speak to him during that time?
11      A.  Yeah, I would say at least several times.
12      Q.  Would it be more than five or less than
13 five?
14      A.  Between five and ten times.
15      Q.  What was his response when you told him
16 about your religion?
17      A.  That he would look into it, that would be
18 it.  "I will look into it," you know.
19      Q.  Do you know that he never looked into it
20 or is it just that he have never responded and gave
21 you some sort of answer?
22      A.  He never responded and gave me some sort
23 of answer.
24      Q.  So is it possible that he contacted the

30

1 chaplain and actually talked to him but just never
2 told you what they talked about?
3      A.  That's hard for me to say because the
4 result is I never got to be a participant with the
5 Nation of Islam.  I never got to participate in
6 Ramadan.  So obviously, you know, in average I can't
7 say he actually did.
8      Q.  But even if he had talked to the
9 chaplain, he still didn't make him change your
10 religion, right?
11      A.  Okay, yeah.
12      Q.  And that's essentially your complaint
13 against him, is that you told him that you were
14 having these issues and you wanted to be changed, and
15 he should have had told the chaplain and he did not?
16      A.  Right, or took it upon himself to do it
17 because he is the chief administrative officer.  He
18 is the one that basically assigned Rojas as chaplain
19 and other people in their respective spots, assistant
20 wardens, dietary and the whole gamut all the way down
21 to the majors.  They are all under his basic
22 authority.
23           And even if he -- you know what I am
24 saying.  I believe a disciplinary thing would have

31

1 pursued that had in fact he did talk to Chaplain
2 Rojas and then Chaplain Rojas rejected his request or
3 instructions.  I believe disciplinary or some form of
4 salient disciplinary measure would have took place.
5      Q.  Against the chaplain?
6      A.  Against the chaplain.
7      Q.  He should have disciplined him for not
8 following orders or something?
9      A.  Yeah, insubordination.
10      Q.  Is there anything else that the warden
11 did that is the basis of your complaint?
12      A.  Not that I can think of at this moment.
13      Q.  Then the other defendant is defendant
14 Michael Randle who is the former director of the
15 Department of Corrections.  What is your claim
16 against him?
17      A.  Oh, that I sent my grievances to
18 Springfield, the Administrative Review Board, and he
19 never -- even if they thought that they were
20 untimely, the merit of the issues in the grievance,
21 he never still took it hard or took the issue to deal
22 with.
23      Q.  So he -- and I don't recall if your
24 grievance was denied or if it was just returned, but

32

1 either way he didn't address the grievance and again
2 didn't order them to change your religion?
3      A.  Right, right, I believe to the best of my
4 knowledge he returned them as untimely through his --
5 at first he returned him as needing to go through the
6 chain of command at the Hill Correctional level.  And
7 then once I was transferred, my understanding he will
8 have no longer jurisdiction to deal with the
9 grievance so it is a direct shot to the
10 Administrative Review Board, and now he is saying it
11 is untimely.
12      Q.  Do you remember if it was a form looking
13 similar to this?  I am looking at a Return of
14 Grievance form.  Was it something like this or was it
15 a letter from the ARB, do you remember?
16      A.  I recall that form there as a form I
17 received.
18      Q.  You didn't recall receiving a letter from
19 the ARB?  Essentially, what happens is, if they deny
20 your grievance, if they look at it and they review it
21 and they deny it, then you get a letter from them.
22 It looks like a letterhead and a normal letter.  If
23 they return it to you like this for untimely or for
24 not following the process, you will get that form.

33

1  Do you ever recall receiving an actual letter from
2  them?
3       A.   No, I don't ever recall receiving an
   actual letter.
5       Q.   So you believe it was on a Return of
6  Grievance form?
7       A.   Yes, ma'am.
8       Q.   Do you recall if that was directly from
9  him or if that was from someone who essentially
10 worked under him?
11      A.   I am unable to recall.
12      Q.   I am trying to find the exact one so that
13 we can look at it and make sure we are both on the
14 same page.
15      A.   All right.
16      Q.   It looks like this is a copy of the
17 initial one that you sent that they returned to you
18 for not being addressed.  Maybe this one.  This one
19 seems to be about protective custody.  It's not the
20 religion one.
21           Here is the one returned to you for being
22 out of time frame.  It looks like it was signed on
23 December 2, 2009.  The grievance is dated September
24 10, 2009.  So this would be the one referring to --

34

1  and I believe you have probably seen it before, but
2  does that look like the document you received when
3  they returned it to you for being out of time frame?
4       A.   Yeah, it does.  Yes.
5       Q.   And just for the record this is Exhibit A
6  of document -- Exhibit A, page 19 of Document 27.
7                 (Whereupon Exhibit A was marked
8                 for purposes of identification
9                 as of this date.)
10           So that's the response that you received
11 after you sent your grievance to the warden's office,
12 right?  Or not the warden, the director's office?
13      A.   Right, for the second time.
14      Q.   The second time.  And then the first time
15 you received a similar form that looked like that but
16 it said that you had to address it at Hill
17 Correctional Center first?
18      A.   Exactly, yes.
19      Q.   Is there anything else against the
   director, former director, Michael Randle, that you
   can think of at this time?
22      A.   Yeah, he wouldn't address my protective
23 custody issues when I was at Stateville and wound up
24 being transferred to Hill from Stateville in 2009.

35

1       Q.   So some other things that before all this
2  religion came all out that you had problems with him
3  before, is that what you are saying?
4       A.   Yeah.
5       Q.   But the basis of your lawsuit is simply
6  about religion, so other than that just showing that
7  he didn't respond before, that doesn't really go to
8  this complaint, exactly to your claim.
9            Does that make sense to you?
10      A.   No, not really.
11      Q.   Okay.  Your complaint here is just about
12 changing your religion, whether or not your religion
13 was changed?
14      A.   Okay.
15      Q.   So the claim against him that you may or
16 may not have about protective custody and all that,
17 that didn't really relate to your change of religion.
18           Do you agree with that?  And if you
19 don't, I am just trying to make sure we are on the
20 same page.
21      A.   Okay.  Approximately I do because it all
22 kind of culminated things, that is escalated beyond
23 their scope.  When I got to Hill and wanted to change
24 my religion but there were other things that preceded

36

1  that and which dealt with protective custody, the
2  unjust segregated confinement, you know, things like
3  that.
4            What I am trying to basically say is
5  trying to get protective custody and being denied
6  that because of size or so-called social history or
7  whatever, the criteria for protective custody, and
8  then ignoring that, I just -- you know, here I come
9  with wanting to change my religion and then you are
10 ignoring that, I see a pattern in there.
11      Q.   Okay.  So to you it shows a pattern of
12 him not responding to your grievances?
13      A.   Right.
14      Q.   Is there anything else he did other than
15 not properly responding to the grievance you filed
16 about religion that he did regarding your attempts to
17 get your religion changed?
18      A.   Not that I can think of at this time.
19      Q.   Backtracking just a little bit because I
20 did find this in the documents, this appears to be
21 the June 10 memorandum that we talked about that you
22 received.  It's dated June 10.  Is this what we were
23 talking about, you received this from the chaplain?
24      A.   Right.

37

1    Q.  And that tells you how to make your
2  change, is that correct?
3    A.  Yes, that's correct.
4    Q.  So then at the bottom there is the place
5  for you to fill that in and that's where you filled
6  in your request for a change and it is dated there
7  July 31?
8    A.  That's correct, uh-huh.
9    Q.  That is Exhibit A of that same document,
10  Bates stamped page 17.
11      And then the page following that, page
12  18, is a response from the chaplain, August 1, and
13  that's what we talked about on August 1 he
14  essentially denied your change?
15    A.  Right, that's correct.
16    Q.  It seems that in reading some of the
17  documents that we have, some of the documents that
18  you sent in your complaint and things like that, that
19  you took issue with a word that he said -- he
20  essentially called Ramadan a religious feast.  Is
21  that kind of what you took issue with in addition to
22  obviously not just making the change?
23    A.  No, I basically took issue with the fact
24  that I was being denied Ramadan, not the feast, being

38

1  denied Ramadan here.
2    Q.  And in the denial it says, and I will
3  read it exactly, "The observance of Ramadan, August
4  22, 2009, has been established, and by Rule 425 no
5  one can change to a religious group that has a
6  religious feast within 45 days.  Therefore, a
7  religion change wouldn't be considered," it says,"
8  until the end of Ramadan."
9      Are you familiar at all with that Rule
10  425 that he is talking about?
11    A.  No.
12    Q.  That limits your ability to change to a
13  religious group?
14    A.  No, I am not that --
15      (Whereupon the deposition was in a
16      short recess.)
17    Q.  So you are not familiar with Rule 425
18  that he talked about in his denial?
19    A.  No, ma'am.
20    Q.  So other than the things that we have now
21  just talked about for each defendant, is there
22  anything else that you want to add that is the basis
23  of your claim against them?
24    A.  Oh, no, not at this moment.

39

1    Q.  And I just ask that because I want to
2  make sure that you have an opportunity to say
3  anything that you want on the record or anything like
4  that.  So, again, like I said at the beginning, if
5  there is something that you remember after we end
6  today, you can send that to me and --
7    A.  Well, I just have a question, but.
8    Q.  Okay, yeah, we can address some
9  questions.  I have a couple just really quick things
10  to get on the record.
11    A.  Okay.
12    Q.  How were you damaged by not being able or
13  not making the change of your religion?
14    A.  I am damaged by being hindered right of
15  worship.  It's a psychological hit.  And then being
16  recognized or respected of that is as well damaging.
17  If I wanted to -- when he speaks about a feast, get a
18  particular diet, Islamic diet, just as with like
19  Kosher diets that they have and other things, I am
20  not capable of doing that and was deprived of doing
21  that.
22      It goes to my health.  I have high blood
23  pressure, one set of things.  These things hindered
24  that and they took, you know, a malicious approach to

40

1  it.  They did not come forthright.  It was simple.  I
2  am not asking for anything outside of what my
3  imprisonment allows one.  I asked within the
4  conditions of my confinement, and I just felt that
5  that was not right.
6    Q.  So just to summarize it, and I don't
7  intend to leave anything out so let me know if I
8  leave out an important part, but essentially your
9  damage is that you weren't able to practice your
10  religion as you wanted to because you weren't able to
11  get the diet and maybe some of the other activities?
12    A.  Right, exactly, to be fully recognized as
13  a worshipper.
14    Q.  Is there anything else that you want to
15  make sure is on the record today?
16    A.  Yeah, I asked at Lawrence Correctional to
17  take me off of the change, and I believe he did,
18  Chaplain Vaughn at Lawrence Correctional, between
19  middle May and mid-June.
20    Q.  That was until your release in June?
21    A.  Right, in June.
22    Q.  At Lawrence Correctional Center?
23    A.  At Lawrence Correctional Center.
24    Q.  And that was May to June of 2011?

41

1    A.   Right.  And the reason I asked that was

2  because I didn't see any fundamental Nation of Islam

3  teachings or mentors, like a pastor.  The equivalence

4  would be an imam.  None of them were made available

   at Lawrence Correctional.

6        MS. JENNINGS:  All right.  I don't have any

7  more questions for you.  So basically what happens

8  now is you have an opportunity to do one of two

9  things.  You can either waive your signature or you

10  can reserve your signature.  Essentially, what your

11  signature means is that you agree that she has taken

12  everything down as we have said it today.  So if you

13  would like to see a copy of that just to make sure

14  there aren't any typos, then that would be reserving

15  your signature.

16        Just to warn you, you can't make any

17  changes to your answers except if we said a date and

18  maybe she wrote it down wrong or, you know, we are

19  talking about 2009 and she wrote 2011 accidently, you

20  can make that change.  But if I had asked you a

21  question like is the stoplight red and you said yes,

22  but when you get a copy you want to change that to

23  no, you can't do that.  That is not an appropriate

24  change.  It is just looking for typos, misspellings,

42

1  things like that.

2        So is that something you would like to

3  see a copy before you sign it or are you competent

4  that she took everything down accurately today.

5        THE DEPONENT:  I would choose to see a copy

6  before I sign it, so.

7        MS. JENNINGS:  Now, what normally happens is

8  I would send it to prison and they would let you look

9  at it and sign it then.  Obviously that's not -- you

10  are not in prison, so.

11        THE DEPONENT:  Thank God.

12        MS. JENNINGS:  And I guess just to add, what

13  date did you get out?

14        THE DEPONENT:  June 20.

15        MS. JENNINGS:  Of this year, 2011?

16        THE DEPONENT:  Yeah.

17        MS. JENNINGS:  So we will work out how that

18  works.  If we can send you a copy at your home, you

19  don't get to keep the copy for free.  This is how she

   makes her money.  She has to charge.  Like I have to

20  pay for my copy and all of that stuff.  So like we

21

22  with talked about, the court may grant you permission

23  or they may pay for a copy for you but that's not

24  something that I have any power over.

43

1        THE DEPONENT:  All right.

2        MS. JENNINGS:  So that would be up to you to

3  request from the court.  I don't know if they

4  normally do that or not.

5        So then you would like to reserve your

6  signature, right?

7        THE DEPONENT:  Yes, ma'am.

8        MS. JENNINGS:  I don't have anything else.

9  We can probably go off the record unless you would

10  like to add anything to the record.

11        THE DEPONENT:  Yeah, I would like to add.

12  What would be the steps behind the deposition today,

13  of this litigation?

14        MS. JENNINGS:  What do you mean the steps?

15  What happens next?

16        THE DEPONENT:  Yes.

17        MS. JENNINGS:  Well, once I receive a copy of

18  that, I will pay for my copy and I will have my copy.

19  We have a deadline coming up, I think it is,

20  September something.  I have a deadline coming up for

21  dispositive motions which basically it would be an

22  additional summary judgment on issues of event

23  exhaustion, which we have already dealt with

24  exhaustion so anything I file then would be on other

44

1  issues.  They are due September 5, 2011.  So around

2  that time I will be filing a motion.

3        Then you will have obviously an

4  opportunity to respond.  If you file anything, I will

5  have an opportunity to respond as well.  Sometimes

6  the court will have a hearing.  A lot of times they

7  will just simply rule on the written motions like

8  they did previously to our other ones.  And then at

9  that point if they deny my motion, if we have claims

10  left, then we will end up going to trial.  And I

11  don't recall if there has been a trial date scheduled

12  or not in this case.  I don't believe that there is

13  an official date yet.  So that's essentially what's

14  going to happen now.

15        THE DEPONENT:  Okay.

16        MS. JENNINGS:  All right.  I think we can go

17  off the record.

18              DEPOSITION CONCLUDED

19

20

21

22

23

24

45

1    ERRATA SHEET
2       I, ISAAC BRIGGS, do hereby certify that I have
     read the foregoing deposition held July 27, 2011, and
3    that it is a true and accurate translation of the
     questions asked of me and the answers given by me,
     with the following change(s):
     Page   Line   Should Be        Reason
5    ____   ____   _____     _____
6    ____   ____   _____     _____
7    ____   ____   _____     _____
8    ____   ____   _____     _____
·9   ____   ____   _____     _____
10   ____   ____   _____     _____
11   ____   ____   _____     _____
12   ____   ____   _____     _____
13   ____   ____   _____     _____
14   ____   ____   _____     _____
15   ____   ____   _____     _____
16   ____   ____   _____     _____
17
18          _____
19          ISAAC BRIGGS
20
     Subscribed and sworn to before me
21
     this _____day of _____, 2011.
22

23   _____
     Notary Public
24

46

STATE OF ILLINOIS    )
                     )  SS
2  COUNTY OF MACOUPIN   )

3          C E R T I F I C A T E
4       I, Carla J. Boehl, a Notary Public and Certified
5   Shorthand Reporter, do hereby certify that prior to
6   the taking of the deposition herein, and on the 27th
7   day of July, 2011, the Deponent ISAAC BRIGGS was, by
8   me, sworn to testify to the truth in relation to the
9   matter in controversy herein.  That on said date the
10  foregoing deposition was taken down in shorthand by
11  me and afterwards reduced to typewritten form by me,
12  and that the foregoing transcript contains a true and
13  accurate translation of all such shorthand notes.
14.      Given under my hand and seal this 10th day of
15  August, 2011, at Springfield, Illinois.
16      My commission expires April 13, 2015.
17
18              s/ Carla J. Boehl
                _____
19              Notary Public
                Certified Shorthand Reporter
                CYB~WOBA~002710
21
22    CARLA J BOEHL
      MY COMMISSION EXPIRES
23    APRIL 13, 2015
24

45

## ERRATA SHEET

I, ISAAC BRIGGS, do hereby certify that I have read the foregoing deposition held July 27, 2011, and that it is a true and accurate translation of the questions asked of me and the answers given by me, with the following change(s):

| Page | Line | Should Be | Reason |
|------|------|-----------|--------|
| 6 | 6 | DEPRACOTE | Mis-Spelled |
| 15 | 2 | COUNSELOR | Should Be Noun/Not Activity |
| 15 | 4 | MY | The typed word is incorrectly used. Word is "THEIR" |
| 27 | 9 | TANK | Mis-Spelled |

_s/ Isaac Briggs_

**ISAAC BRIGGS**

Subscribed and sworn to before me

this 23rd day of August , 2011.

_s/ Cynthia A. Blaylock_

Notary Public

OFFICIAL SEAL
**CYNTHIA A. BLAYLOCK**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2-18-2015